THERESE GEMKOW *et al.*

*v.*

ROMAN LINK.

*Opinion filed December 22, 1906—Rehearing denied Feb. 8, 1907.*

1. MORTGAGES—*general rule as to payment by mortgagor without notice of assignment.*   Payment of the mortgage indebtedness by the grantor in a trust deed, to the grantee, without notice that the trust deed has been assigned, is a discharge of the indebtedness, and may be set up in bar of a bill to foreclose the trust deed in the absence of any other facts or circumstances which preclude the mortgagor from presenting such defense.

2. SAME—*when foreclosure of a trust deed is not barred.*   Payment to the trustee, by the grantor in a trust deed securing a note payable to his own order and endorsed in blank, without knowledge that the note had been sold by the trustee, who executed a release of the trust deed and said he would burn the note, does not bar a suit by the legal holder of the note, before maturity, to foreclose the trust deed, where the grantor, after the alleged payment, executed extension agreements recognizing the existence of the note and the trust deed and agreeing to their continuance in force.   (*Napieralski* v. *Simon,* 198 Ill. 384, distinguished.)

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Circuit Court of Cook county; the Hon. M. F. TULEY, Judge, presiding.

JOHN STELK, for appellants.

JULE F. BROWER, and SAMUEL B. KING, for appellee.

Mr. JUSTICE FARMER delivered the opinion of the court:

This suit was begun by appellee filing a bill in the circuit court against Charles Gemkow, his wife, Therese, and other defendants, for the foreclosure of a trust deed on certain real estate therein described.

The trust deed sought to be foreclosed was executed on September 30, 1892, by Gemkow and wife to Charles C. Schumacher, trustee, to secure a note of even date for $1100, signed by Charles Gemkow, payable to his own order three years after date, with interest at six and one-half per cent per annum, payable semi-annually. It appears from the evidence that Schumacher sold the note to O'Brien; that it afterwards came back into Schumacher's possession, who sold it to appellee in the spring of 1896. The bill of appellee admits the payment of $100 on the principal of the note, and claims there was due on said note $1000 principal and interest from March 30, 1903. On September 9, 1898, Gemkow made and delivered to Schumacher another note for $1100, payable to his own order three years after date, with interest at six per cent per annum, interest payable semi-annually, and evidenced by six interest notes. This note was secured by a trust deed to Schumacher, as trustee, on the same property described in the trust deed sought to be foreclosed. September 9, 1901, Gemkow borrowed from Austin E. Morey, one of the defendants to the bill to foreclose, $1200, for which he executed his note, payable to the order of himself five years after date, with interest at six per cent per annum, and secured the same by a trust deed executed by himself and wife to Pauling, as trustee, upon the same real estate described in complainant's bill and trust deed. Gemkow testified he borrowed the money from Morey

to pay off the note given Schumacher September 9, 1898, and that he did pay off and take up said note. Schumacher executed a release of the trust deed given to secure the note of September 9, 1898, on the 18th of September, 1901, which was recorded the same day. The answer of Gemkow and wife admits the execution and delivery to Schumacher of the note described in the bill, and also the trust deed, but avers the payment of $100 on the principal to Schumacher and all interest on said note to September 30, 1898; that on September 9, 1898, respondent Charles Gemkow gave Schumacher another $1100 note, for which he received $100 cash and the remaining $1000 was applied as payment of the note of September 30, 1892; that he never received the 1892 note, but that Schumacher told him he had destroyed it, and executed and gave to him a release of the trust deed, which he caused to be recorded; that September 18, 1901, he paid off and took up the 1898 note and Schumacher executed a release of the trust deed given to secure it. Respondents aver that they never had any notice or knowledge of the assignment of the 1892 note to appellee; that all their dealings were with Schumacher and they were led to believe he was the owner of said notes. They deny having ever defaulted in the payment of said note; deny there is anything due thereon, but aver it was paid with the loan secured from Morey September 9, 1901. The parties made defendants by reason of their interest in the Morey note and trust deed answered the bill, setting up their interest in the premises, and also filed a cross-bill. The cause was heard by the court and a decree entered finding that the Morey trust deed was a prior lien on the premises, and finding that there was due appellee on the note of September 30, 1892, of principal and interest, $1122.08; also allowing appellee $100 solicitor's fee. The decree ordered the payment to appellee, by Gemkow, of $1222.08 within three days, and that in default thereof the premises be sold, subject to the lien of the trust deed given to secure the Morey note. From that decree

Gemkow and his wife prosecuted an appeal to the Appellate Court, where the decree of the circuit court was affirmed, and an appeal is prosecuted from the judgment of the Appellate Court to this court.

No question is raised as to the correctness of the decree so far as it relates to the Morey note and trust deed given to secure it. The only contest is as to the note and trust deed of September 30, 1892.

It is contended by counsel for appellants that all of their dealings were with Schumacher under the belief that he was the owner of the note and trust deed; that they had no knowledge of any assignment or sale of them to any one, and that in the absence of such notice Charles Gemkow had a right to deal with Schumacher as the owner and to pay the note off and take from him a release of the trust deed given to secure it.

September 30, 1895, Gemkow signed an agreement extending the time of payment of the note three years. On that date he paid $100 on the principal, and by the agreement the interest was reduced to six per cent. September 30, 1898, Gemkow signed another agreement extending the time of payment two years; September 29, 1900, another one extending the time of payment two years; and September 30, 1902, another one extending time of payment three years. When appellee became the owner of the note and trust deed the note had something near two and one-half years to run under the first extension. This extension agreement and the interest notes were turned over to him with the principal note and trust deed. By said extension agreement the note would mature September 30, 1898. On September 9, 1898, as above stated, Gemkow gave Schumacher another note for $1100, due three years after date and secured by a trust deed on the same property as the first one. September 30 of the same year, the day the first note matured under the extension agreement of September 30, 1895, Gemkow executed another agreement extending the

time of payment of the note dated September 30, 1892, two years, or until September 30, 1900, the interest being evidenced by four interest notes for $30 each. This extension agreement gave the holder of the note the option to declare it due for a default in the payment of interest, and provided that the trust deed given to secure the note should remain in full force till the note was paid. September 29, 1900, another agreement was executed extending the time for the payment of said note two years more, and September 30, 1902, another one extending time of payment three years, and at the same time notes were given for the semi-annual installments of interest. Each of these last two extensions contained similar options of declaring the principal sum due for a failure to pay interest, and provisions for the remaining in force of the trust deed, as the extension agreement of 1900. The name of appellee was written as payee in the interest notes that were executed at the time the last extension was made, and which were introduced in evidence on the hearing; but this the decree finds was done after Gemkow had signed them, with a blank left for the payee's name, and without his knowledge. The decree also finds that Gemkow had no knowledge that appellee was the owner of the note and trust deed. Though a weak denial that Gemkow signed the extension agreements is made, the evidence abundantly warranted the conclusion that he did sign them. The first extension agreement executed was turned over to appellee by Schumacher when he bought the note and the others as they were executed. It is true, Gemkow was a rather stupid German, unable to read and write the English language, and appears to have fully trusted Schumacher, who died insolvent in May, 1903.

Gemkow testified that when he gave the second $1100 note September 9, 1898, Schumacher told him the old note was no longer good. He says Schumacher showed him the note and told him he would burn it up, and that the note and trust deed he then gave were in satisfaction and payment

of the note given in 1892, and that he did not, except possibly $100, get any money from Schumacher when he gave the note on September 9, 1898. The testimony of Therese Gemkow, wife of Charles, tended to corroborate him. This testimony is in conflict with the recitals in the three extension agreements signed by Gemkow, respectively, September 30, 1898, September 29, 1900, and September 30, 1902. It will be observed that the first mentioned of these extensions was executed the same month and but a few days later than the note and trust deed Gemkow says were executed to pay this note off. Each of these extension agreements specifically mentions and describes the note dated September 30, 1892, and the trust deed given to secure the same, and expressly provides that the trust deed given to secure said note shall remain in full force and effect until said note is paid. In the absence of these extension agreements it would be very clear that appellee would not be entitled to a decree of foreclosure. In *Towner* v. *McClelland,* 110 Ill. 542, it was said (p. 551) : "Where a mortgage is assigned, and the mortgagor, without notice, pays the payee, who has parted with the note, that will discharge the mortgage, and in a suit to foreclose, such payment may be set up in bar of a decree for its foreclosure. The mortgagor, to release himself from liability on his note, must see that he pays the money to the holder of the note, who has received it by assignment before maturity, but not so to discharge the mortgage, because it is not assignable at law. The equitable assignee, to protect his rights against a payment by the mortgagor to the mortgagee, must give the former notice, actual or constructive, of its assignment."

*Napieralski* v. *Simon,* 198 Ill. 384, is a case where the transaction and all its facts are strikingly similar to the transactions and facts involved in this case, except as to the extension agreements. In that case Napieralski made a note for $300, payable to his own order five years after date, and delivered it to Schintz, from whom he had obtained the

money. He and his wife also executed to Schintz, as trustee, a trust deed on real estate to secure the note. The interest was paid on the note to Schintz by Napieralski until it become due, in October, 1891, when an agreement was executed extending the time of payment five years and new interest notes given. These interest notes were paid to Schintz by Napieralski as they matured. In the spring of 1894 Simon bought the note and trust deed from Schintz and thereafter Schintz paid him the interest. Simon never notified Napieralski that he had bought the note, and in October, 1895, Napieralski paid Schintz $200 to apply on the principal. In September, 1896, Schintz notified Napieralski the note would be due the 23d of the following month. Thereupon Napieralski called at the office of Schintz, and it was agreed that he should procure a loan for Napieralski for $2800 to pay off the indebtedness. Thereupon Napieralski executed notes for that amount payable to his own order, endorsed them in blank, delivered them to Schintz, and he and his wife executed and delivered to Schintz, as trustee, trust deeds on the same property described in the one first mentioned, to secure said notes. Schintz, in the same month the $3000 mortgage debt became due, sold one of the last mentioned notes and trust deeds to one Auten and the other note and trust deed to one Diedesch and received the money for them. Schintz executed and delivered to Napieralski a release of the original trust deed. Simon, as the holder of the original note and trust deed, filed a bill to foreclose and set aside the release made by Schintz as fraudulent. The court said (p. 387): "This is not a suit at law on a negotiable instrument, but is a proceeding in equity to foreclose a mortgage,—a non-negotiable instrument,— and must be controlled by equitable principles. It was assignable only in equity, and was subject to the same equitable defenses as if sought to be foreclosed by Schintz on his own behalf. It was the duty of Simon to give notice to the maker of the assignment to him if he would protect

himself from payment to the original holder. Such notice would have enabled appellants to protect themselves from the fraudulent representations of Schintz by making payment to the true owner. At all events it would have been a compliance on his part with his duty in the premises. Having failed to give such notice he is in no position to invoke the equitable doctrine that where one of two innocent persons must suffer loss because of the fraud of a third person, the loss must fall on him who by his conduct has put it in the power of such third person to make the loss possible. Simon was in fault in failing to give notice of the assignment to him." This case would be conclusive of the one at bar but for the extension agreements. The same rule is recognized also in *Schultz* v. *Sroelowitz,* 191 Ill. 249. In that case the mortgagor sold the land and the purchaser assumed and agreed to pay the mortgage indebtedness, and the court held that while the assignee of the note and mortgage, to protect his rights under the mortgage, would have been required to give the mortgagor notice that he owned it, he owed no such duty to the grantee of the mortgagor.

The rule announced in these cases, however, cannot apply here, for the reason that by three separate instruments in writing executed by Gemkow after he claims to have paid off the note in controversy he recognized the existence of the note and the trust deed and agreed to their continuance in force. By the last extension agreement, which was executed by Gemkow September 30, 1902, only a year before the suit was brought, the note would not mature, except for default in the payment of interest, until September 30, 1905. Why Gemkow should sign these agreements if he had paid the note off is difficult of comprehension. He says he signed anything Schumacher told him to, but he does not pretend to give any circumstance connected with the signing of said agreements. He does not tell anything Schumacher did or said to induce him to sign them, nor what he represented them to be, nor the purpose of their execution. As

we have said, his only explanation is a weak denial, which is unsupported by the evidence. We think these facts render the rule announced in the cases above cited inapplicable; that after going on for years after he says he paid the note to Schumacher, acknowledging in writing, for the benefit of the legal holder, the continued existence of the note and trust deed, the chancellor was justified in decreeing that appellee was entitled to foreclose said trust deed.

It is also urged that the chancellor erred in holding Therese Gemkow, wife of Charles Gemkow, was not a competent witness. It does not clearly appear that he so ruled. When she was offered as a witness appellee objected on the ground that as the wife of Charles Gemkow she was not a competent witness. The court remarked he was inclined to think she was not competent but that he would hear her testimony subject to the objection. She was permitted to answer all questions asked her except as to the handwriting of the signatures to the extension agreements. With that exception appellants had the benefit of her testimony, and it nowhere appears that it was not considered by the court in determining the case. We do not think she was a competent witness, but if she were, her evidence would not require a reversal of the case.

A number of other grounds are urged for a reversal of the case, principally relating to the pleadings. We have endeavored to discuss the meritorious and controlling questions involved, and while we have examined all the questions raised by counsel, we are of opinion the objections not herein discussed are not of such importance as to require mentioning them specifically.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*